**EXHIBIT "A"**

# ORIGINAL

SEAN K. CLAGGETT, ESQ.
Nevada Bar No. 008407
SEAN K. CLAGGETT & ASSOCIATES
9910 W. Cheyenne Ave. Ste. 110
Las Vegas, Nevada 89129
(702) 655-2346

Attorney for Plaintiff

FILED
JUN 19  11 29 AM '07

CLERK OF THE COURT

## CLARK COUNTY DISTRICT COURT

### STATE OF NEVADA

AmTech, Inc., a Nevada Corporation,

            Plaintiff,

vs.

JEFFORY FAIRBROTHER, an
Individual, LAWRENCE CREEGER,
an Individual, GLOBAL
EVENTMAKERS, INC., a Florida
Corporation, STEVE DURLAND, an
individual, DURLAND & COMPANY
CPAS, P.A., a Florida Professional
Association,

            Defendants.

CASE NO: A542092
DEPT. NO: XIII

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff, AmTech, by and through its attorney of record, SEAN K. CLAGGETT, ESQ., of SEAN K. CLAGGETT & ASSOCIATES, LLC. and hereby complains and alleges as follows:

    1.    AmTech (hereinafter "AmTech") is a corporation duly organized under the laws of the State of Nevada, with its principal place of business in Las Vegas, Nevada.

    2.    Upon information and belief, Global Eventmakers, Inc. (Hereinafter "GEM"), is a corporation duly organized under the laws of the State of Florida, with its principal place of business in Palm Beach, Florida.

///

///

RECEIVED
JUN 1 9 2007
CLERK OF THE COURT

1    3.    Upon information and belief, Lawrence Creeger (hereinafter
2  "Creeger"), is an individual who has at all times relevant herein been a resident
3  of the city of Palm Beach, State of Florida.

4    4.    Upon information and belief, Jeffory Fairbrother (hereinafter
5  "Fairbrother"), is an individual who has at all times relevant herein been a
6  resident of the County of Arapahoe, State of Colorado.

7    5.    Upon information and belief, Steve Durland (hereinafter "Durland"),
8  is an individual who has at all times relevant herein been a resident of the city of
9  Palm Beach, State of Florida.

10    6.    Upon information and belief, Durland & Company CPAS, P.A..
11  (Hereinafter "D&C"), is a professional association duly organized under the laws
12  of the State of Florida, with its principal place of business in Palm Beach,
13  Florida.

14    7.    The claims being brought by AmTech are proper as the amount in
15  controversy exceeds $10,000.00 and there is complete diversity between the
16  parties.

17    8.    In the spring of 2001, Jeffory Fairbrother (hereinafter "Fairbrother") and
18  Thomas Neavitt (hereinafter "Neavitt") were introduced to one another in Las Vegas,
19  Nevada, by a mutual friend.  The purpose of this meeting was that Fairbrother was
20  introduced to Neavitt as a possible investor into a company (AmTech) that Neavitt was
21  an shareholder of.

22    9.    Shortly after this meeting, Fairbrother began to borrow money from
23  AmTech.

24    10.    Fairbrother promised to repay all of the money he was borrowing from
25  AmTech once he sold a piece of art, known as the Constitutional Monument, to the
26  Mormon Church.

27  ///
28  ///

2

11.    During this time, Fairbrother explained to Neavitt that there was another monument created by the same artist (Brett Livingstone Strong) known as the Presidential Monument, which Fairbrother could purchase for $300,000.00.

12.    In an effort to put Neavitt at ease regarding the money that Fairbrother owed AmTech, Fairbrother explained that the Constitution Monument had been appraised at $6,000,000.00 and the Presidential Monument had been appraised at $15,000,000.00.

13.    Based upon the information provided by Fairbrother, Neavitt along with a group of investors formed American Monument Foundation, LLC., (hereinafter "AMF"), with the intent to purchase the Presidential Monument.

14.    After the purchase of the Presidential Monument, Fairbrother told Neavitt and the other members of AMF that if AMF also purchased the Constitution Monument, that AMF would make substantial funds from the sale of said monument to the Mormon Church.

15.    Fairbrother explained that if AMF agreed to purchase the Constitution Monument that he would then be able to pay back the money he had borrowed from AmTech, and it would enable him to make his $1,000,000.00 investment in AmTech.

16.    Fairbrother also agreed that with the purchase of the Constitution Monument, he would give AMF the "Plaque Program", which was intended to create bronze replicas of the U.S. Constitution and Bill of Rights to be placed in schools around the United States.

17.    The agreement between AMF and Fairbrother, which was predicated on the fact that Fairbrother had clear title, knew of the location of the monument, and the monument was in good condition, was executed by all parties in Las Vegas, Nevada on February 5, 2002.

18.    On February 5, 2002, Fairbrother sold to AMF both the Constitution and Presidential Monuments.

///

3

19.    Shortly after the sales were completed from Fairbrother to AMF, Fairbrother told AMF that the sale to the Mormon Church had fallen through, and that the artist, Brett Livingstone Strong had filed suit in Virginia claiming that he was the true owner of the Presidential Monument (hereinafter "Virginia Suit").

20.    The litigation against Strong continued for well over a year, and culminated with AMF prevailing in the United States Fourth Circuit Court of Appeals.

21.    AMF was forced to expend substantial money (in excess of $430,000.00) in order to protect its interests that Fairbrother had misrepresented to it when AMF decided to purchase the monuments from Fairbrother.

22.    As a result of the Virginia suit, AMF and Fairbrother entered into an amendment to the purchase agreement.

23.    The amendment recognized that the actions of Strong had prevented AMF from performing under the terms of the contract, and the amendment extended the closing date until June 30, 2003.

24.    During the course of the litigation against the artist, neither monument could be sold due to the cloud in the title.

25.    Almost immediately after AMF had finally cleared title to the monuments as it pertained to the artist (Strong), Fairbrother filed suit in the United States District Court for the District of Colorado, case number 03-W4-1238-CB(PAC).

26.    Due to the lack of personal jurisdiction over AMF, it filed a Motion to Dismiss Fairbrother's complaint.

27.    Ultimately, said Colorado Suit was dismissed on September 27, 2004, as AMF had not availed itself to jurisdiction in Colorado.

28.    On October 14, 2004, AMF filed suit against Fairbrother in the Eighth Judicial District Court of Nevada, Clark County, case number A493645, to quiet title to the Monuments.

29.    On January 5, 2005,  filed his Notice of Removal of Action Under 18 U.S.C. §1441(b) (Diversity), case CV-S-05-00019-PMP(PAL).

4

1    30.    On January 20, 2005, Fairbrother filed his Response to the Court's Order
2  Concerning Removal to Federal Court in case CV-S-05-00019-PMP(PAL).  In said
3  response Fairbrother stated the following: "Fairbrother is without knowledge of any
4  defendant, other than himself, and therefore states that there are **no defendants who**
5  **are residents of Nevada**."

6    31.    Due to Fairbrother failing to file an answer, on March 29, 2005 AMF filed
7  its request to enter default against Defendant Jeffory Fairbrother in case CV-S-05-
8  00019-PMP(PAL).

9    32.    Prior to the Court ruling on AMF's motion, on April 21, 2005, Fairbrother
10  filed his Answer and Counterclaim in case CV-S-05-00019-PMP(PAL).

11    33.    In Fairbrother's Counterclaim he specifically requests the following from
12  this Court:

13    26.   Pursuant to 28 U.S.C. §2201, and as a result of default by AMF
14    pursuant to the Purchase Agreement, the Promissory Note the
15    Security Agreement, and the Extension Agreement Fairbrother is
16    entitled to declaratory judgment that Fairbrother is entitled to
17    ownership of title to the Presidential Monument and the
18    Constitution Monument and to immediate possession of the
19    Monuments because AMF has failed to make payment as and
20    when due under the Note, the Purchase Agreement and the
21    Extension Agreement.  Further, pursuant to paragraph 4/5 of the
22    Security Agreement, Fairbrother is entitled to sell the Monuments in
23    order to recover the monies owed to him.

24    27.   Fairbrother seeks an Order of this court granting him judicial relief
25    in accordance with the terms of the Security Agreement....

26    29.   AMF owes Fairbrother the amount of $2,500,000.00 together with interest
27    accruing thereon, cost and attorneys' fees incurred in collection of the
28    monies due and owing, in an amount to be proven at trial.

5

1   34.   On May 2, 2005, AMF filed a motion to strike Fairbrother's answer due to
2   Fairbrother's listing false addresses on his pleadings, in violation of Local Rule 10-2.

3   35.   On June 17, 2005, AMF and Fairbrother filed a Stipulated Discovery Plan
4   and Scheduling Order.  In said Order, discovery was scheduled to be closed as of
5   October 25, 2005.  Additionally, the Order required that any parties were required to be
6   added no later than July 25, 2005.

7   36.   On August 15, 2005, AMF noticed the deposition of Fairbrother.

8   37.   Additionally, on August 15, 2005, AMF filed its Opposition to Fairbrother's
9   Motion for Protective Order regarding his deposition being taken.

10   38.   On August 30, 2005, Judge Leen filed an order regarding the new
11   discovery dates, which extended discovery through December 27, 2005.

12   39.   On September 1, 2005, Judge Leen heard arguments from both AMF's
13   counsel and Fairbrother regarding Fairbrother's Motion for Protective Order.

14   40.   At no time during the September 1, 2005, oral argument did Fairbrother
15   inform the Court that he had assigned his interest in the promissory notes and
16   monument to Global.

17   41.   On September 1, 2005, Judge Leen issued her Order regarding
18   Fairbrother's Protective Order.

19   42.   On September 12, 2005, counsel for AMF received Fairbrother's
20   disclosures required under FRCP 26(a)(1).

21   43.   Specifically, Fairbrother's 26(a)(1) disclosure listed "Lawrence Creeger
22   C/O Global EventMakers, Inc., 326 Peruvian Ave., Palm Beach FL 33480; (804) 301-
23   5773. Mr. Creeger has had various involvements with the Monuments over many
24   years.  He may have discoverable information on this and other facts or issues related
25   to the transaction that is the subject of this lawsuit, including counterclaims."

26   44.   On September 16, 2005, AMF filed its answer to Fairbrother's
27   counterclaim.

28   ///

6

1    45.    On September 19, 2005, AMF was forced to file an Order to Show Cause

2  why Fairbrother should not be held in contempt for his failure to participate in the

3  Discovery process.

4    46.    On November 1, 2005, there was a hearing regarding said Order to Show

5  Cause, and Judge Leen ruled accordingly.

6    47.    Ultimately, Judge Leen ordered that Fairbrother's deposition was to be

7  taken on December 1, 2005, in Denver Colorado.

8    48.    On December 1, 2005, Fairbrother appeared for his deposition regarding

9  case CV-S-05-00019-PMP(PAL).

10    49.    During his deposition he was asked about his relationship with Larry

11  Creeger and Global Eventmakers, Inc., at length.  The following are several of the

12  excerpts from Fairbrother's deposition:

13    Pages 92 - 94

14    Q:    In March of 2005, of this year, did you assign the liens?

15    A:    Yes.

16    Q.    Who did you assign them to?

17    A.    Global Event Makers.

18    Q.    Who is that?

19    A.    Larry Creeger.  It was related to – I sold everything to them in May of

20         2004, and then part of that was to assign the liens so they could formally

21         collect on them.  So I don't have any interest in them whatsoever.

22    Q.    You don't have any interest in the liens?

23    A.    None whatsoever. I don't own them.

24    Q.    Why did you file a counterclaim against them?

25    A.    I'm sorry?

26    Q.    Why did you file a counterclaim for them?

27    A.    Because I have received far less compensation under my agreement with

28         Global Event Makers then I'm entitled to pursuant to these agreements.

7

| 1 | Q. | How much did they pay you? |
|---|---|---|
| 2 | A. | It's privileged information. |
| 3 | Q. | What's the privilege? |
| 4 | A. | I'm not telling you what they paid me.  It's a contract that I entered into |
| 5 | | with them and that's the end of the story. |
| 6 | Q. | Well, if you entered into a contract with them, then you don't have any |
| 7 | | standing in this lawsuit or do you? |
| 8 | A. | I've just told you.  Of course I do.  I'm entitled to claim the difference |
| 9 | | between what I got from them and what AMF owes me. |

10   *Page 97 lines 14-21*

| 11 | Q. | So you have no standing in this litigation? |
|---|---|---|
| 12 | A. | I have explained to you twice before, the standing that I have is that I'm |
| 13 | | entitled to the difference that I got from Global Event Makers and what I |
| 14 | | was entitled to be paid under the promissory note.  That's what I'm |
| 15 | | entitled to. |

16   *Page 100 lines 7-15*

| 17 | Q. | Okay.  So what is your standing in this case again?  Can you describe that |
|---|---|---|
| 18 | | for us? |
| 19 | A. | I've explained it three times. |
| 20 | Q. | I don't understand. |
| 21 | A. | Well, my standing in this case is that I'm entitled for what I was owed, |
| 22 | | which is now with interest about 3.5 million bucks versus what I got from |
| 23 | | Global.  I'm entitled to the difference, to the damages and the difference. |

24   *Pages 113-115*

| 25 | Q. | Can you describe for me the contract between you and Global Event |
|---|---|---|
| 26 | | Makers so I can understand what their relevant position is in this litigation, |
| 27 | | if any? |

28   ///

8

| | | |
|---|---|---|
| 1 | A. | No.  They are not involved in this litigation.  They are just going to collect |
| 2 | | on the liens.  That's all I know. |
| 3 | Q. | Okay.  So they don't have a right to the monuments? |
| 4 | A. | Well, they've got all the rights under these agreements, under these |
| 5 | | purchase agreements and security interest and promissory note. |
| 6 | Q. | So what right do you have in them? |
| 7 | A. | None, I suppose. |
| 8 | Q. | I'm just confused and I'm just trying to clarify this.  Because you say that |
| 9 | | you have none, but then you are entitled to a difference between what |
| 10 | | they give you and what you are owed? |
| 11 | A. | Yeah.  That's what I've been told.  That's exactly right.  That's why I had to |
| 12 | | file a counterclaim. |
| 13 | Q. | Because only you have the right to the interest of the difference, correct? |
| 14 | A. | Only I have the right to the interest in the difference.  Yeah, that's as I |
| 15 | | understand it.  Because what I'm owed by AMF and what I've got for |
| 16 | | selling the contracts and the agreements and everything is a big |
| 17 | | difference, a huge difference.  And so that's why I'm continuing with the |
| 18 | | litigation. |
| 19 | Q. | What happens if you win this litigation?  How much money goes to Event |
| 20 | | marketing - Event Global Makers get? |
| 21 | A. | They don't get anything out of - |
| 22 | Q. | What you win? |
| 23 | A. | They get - they are going to collect on these liens and that's their money. |
| 24 | | They can do what they like with it. |
| 25 | Q. | What if you get the monuments? |
| 26 | A. | What? |
| 27 | Q. | In this lawsuit, what you are asking for the court is to enforce a foreclosure |
| 28 | | action on the monuments, right? |

9

| 1 | A. | Uh-huh. |
|---|----|---------|
| 2 | Q. | If you win that and you sell- they get foreclosed and you won them now, |
| 3 | | Event Global Makers gets nothing, correct, because then you'll own the |
| 4 | | monuments? |
| 5 | A. | Well, I don't know how that would work. I don't understand how that |
| 6 | | would work. I'd have to ask Larry what he'd want to do. |
| 7 | Q. | Larry Creeger is aware of this litigation? |
| 8 | A. | Oh, yeah. |
| 9 | Q. | And what has Larry Creeger told you about this litigation? |
| 10 | A. | He told me to show up at this deposition today. |

11   *Page 118 line 1-5*

| 12 | Q. | And Creeger told you to come to this deposition, right? |
|----|----|---------|
| 13 | A. | He advised me that I should show up. Yeah. |

14   *Page 121 - 123*

| 15 | Q. | You filed this (counterclaim) after you had assigned some interest to |
|----|----|---------|
| 16 | | Creeger? |
| 17 | A. | The whole interest. Yeah. |
| 18 | Q. | Okay. When you filed this counterclaim, did you have knowledge that you |
| 19 | | had signed away your interest? |
| 20 | A. | Yeah. |
| 21 | Q. | Explain to me how you were able to in good faith file this counterclaim? |
| 22 | A. | Well, because I was told that I needed to keep the litigation going and I |
| 23 | | needed to have a counterclaim filed. |
| 24 | Q. | And who told you that? |
| 25 | A. | A number of people? |
| 26 | Q. | Who? |
| 27 | A. | Ann McGihon. |
| 28 | Q. | Who else? |

10

1    A.    Ann McGihon told me.

2    Q.    Why did she tell you you need to keep this litigation going?

3    A.    I don't know.  She was - she's a lawyer.  She said you need to keep the

4         litigation going because you're entitled to get the difference between

5         Creeger and what they owe you.  So you've got to keep the litigation

6         going.

7    Q.    Okay.  So your goal has been to keep this litigation going?

8    A.    Yeah.

9    Q.    And if you win in this litigation -

10    A.    Yeah.

11    Q.    - you would get what you crave for here, is the monuments in lieu of

12         payment or payment in lieu of monuments, one or the other.  Either pay

13         you the money they owe you or give you the monuments back, right?

14    A.    That's how I understand it.

15    Q.    Okay.  And what then is the result of these security agreements or these

16         assignments of liens you have with Creeger?

17    A.    Well, if that ever happened, I just give them to Creeger, I suppose.  I don't

18         know.  We haven't spoken about that.  Because - we just haven't spoken

19         about that.

20    Q.    What have you and Creeger spoken about regarding this assignment of

21         lien and this complaint?

22    A.    Just about, you know, that he's aware of the documents and he's aware of

23         the litigation.  He's aware of everything.

24    Q.    And you provided him with a copy of the counterclaim, answer and

25         counterclaim?

26    A.    I can't remember whether he got that or not.

27    Q.    You provided him with legal documents, though, to keep him abreast of

28         what's going on in the litigation?

11

1      A.      From time to time.

2   *Page 129-130*

3      Q.      Do you owe anybody money?

4      A.      Not really.  I mean I owe my parents a lot of money.

5      Q.      Are you aware that you owe Tom AmTech over $13 million?

6      A.      That was that.  Yeah.

7      Q.      You are aware that you owe him like $13 million?

8      A.      Oh, yeah, I don't think he's got much chance of ever seeing that.

9      Q.      Okay.  And you believe that Tom owes you about $3 million, $3.5 million?

10     A.      Yeah.  Well, he owes Creeger $3.5 million.

11     Q.      That's clever.

12     A.      He doesn't owe me $3.5 million.  He owes Creeger $3.5 million.

13  *Page 139*

14     Q.      What does Global Event Makers do?

15     A.      I don't know.  I haven't got a clue.

16     Q.      How often do you talk to Larry Creeger?

17     A.      Sometimes occasionally; sometimes twice a day.

18  *Page 154-155*

19     Q.      What's your understanding of the debt that you currently owe Tom

20             AmTech from the judgment he has obtained against you?

21     A.      It's meaningless to me.

22     Q.      Why is that?

23     A.      Because it's meaningless to me because I haven't got any.

24     Q.      Except for the monuments?

25     A.      I don't have the monuments.  We've been through this a hundred times.

26             It's Creeger's monuments.  He's got the liens and the contracts and the

27             rights.  I got nothing to do with it.

28     Q.      So Creeger has all the interest you had in the monuments?

12

1    A.    As far as I understand it, that is correct.

2    Q.    Okay.  So at this point you have no -

3    A.    We've been through this.  I told you, I'm seeking damages for the

4          difference between what I ultimately can get from Creeger and the stock

5          and the debt relief versus what I'm owed.  I mean, we've been through

6          that ten times.

7    50.   On December 21, 2005, AMF filed an Expedited Application for Order to

8    Show Cause Why Defendant Jeffory Fairbrother Should Not Be Held In Contempt For

9    Appearing At His Deposition Drunk.

10    51.   On December 28, 2005, Judge Leen issued the Order to Show Cause,

11   and set the hearing for January 17, 2006.

12    52.   At the hearing of January 17, 2006, counsel for AMF appeared, however,

13   Jeffory Fairbrother did not appear.  Judge Leen ordered that the hearing be continued

14   until February 2, 2006.

15    53.   On February 2, 2006, the order to show cause was conducted by Judge

16   Leen, and AMF through its counsel appeared, as did Fairbrother.

17    54.   At no time during the hearing of February 2, 2006, did Fairbrother indicate

18   to the Court that he had assigned all of his interest to Global.

19    55.   On February 15, 2006, AMF filed a mutually (between AMF and

20   Fairbrother) executed Stipulation and Order which stated in part "...the copy of the

21   Promissory Note, which was attached to Jeffory Fairbrother's deposition transcript shall

22   act as, and have the same force and effect as the original Promissory Note."

23    56.   On or about March 28, 2006, Fairbrother filed a letter in case 2:05-cv-

24   00019-PMP(PAL), in which he requested to dismiss his counterclaim against AMF for

25   Declaratory Judgment for Immediate Possession.

26    57.   At no time did Fairbrother ever released his counterclaim against AMF for

27   Monies Owed on a Promissory Note.

28   ///

                                         13

1      58.   On May 5, 2006, AMF filed its response to Fairbrother March 28, 2006

2   Letter.

3      59.   In its May 5, 2006, response to Fairbrother's March 28, 2006 Letter, AMF

4   informed the Court that the alleged assignment between Fairbrother and Global was a

5   fraudulent transfer.

6      60.   On May 11, 2006, Judge Pro ruled that Count 1 of Defendant

7   Fairbrother's Counterclaim is hereby dismissed with prejudice.

8      **Factual History of Relationship Between Global Eventmakers, Inc. (Hereinafter**

9                                **GEM) And AMF.**

10     61.   AMF and GEM were in negotiations during the Spring of 2004.

11     62.   On May 2, 2004, AMF and GEM entered into an Asset Purchase

12   Agreement.        63.   Pursuant to the terms of the May 2, 2004, GEM agreed to

13   purchase the Constitution and Presidential monuments for a total of $600,000.00.

14     64.   GEM agreed to consummate an agreeable settlement agreement and

15   dismissal on the Settlement Date of any and all law suits between Fairbrother, Neavitt

16   Corporation, AMF, and AmTech.

17     65.   GEM was to perform under these terms by May 22, 2004.

18     66.   On June 2, 2004, Larry Creeger emailed Neavitt regarding a change to

19   Schedule 1.2.

20     67.   As of August 23, 2004, GEM had not been able to control Fairbrother,

21   which prompted AMF to send GEM a demand to perform.

22     68.   Specifically, AMF requested in its August 23, 2004, letter that GEM pay it

23   the $600,000.00 and to have Fairbrother sign complete and final releases regarding all

24   pending litigation.

25   ///

26   ///

27   ///

28

                                    14

1    69.    Additionally, in AMF's August 23, 2004, letter, it added several additional
2  issues involving Fairbrother and AMF, Neavitt, and AmTech were added to the list of
3  outstanding disputes between them that had to be resolved to consummate this
4  contract. Most notably, the request was made for Fairbrother to assign over his two
5  Chinese Gold Bonds for which he never paid Neavitt.

6    69.    In response to this August 23, 2004, letter, Creeger on behalf of GEM,
7  drafted a letter on September 12, 2004 to AMF.

8    70.    In this September 12, 2004 letter, Creeger stated "We do not anticipate
9  the contingencies referred to in your letter and memorandum to be a deal breaker...."

10    71.    On October 5, 2004, Creeger on behalf of GEM sent a follow up letter
11  regarding the documentation needed in support of several of the contingencies.

12    72.    In response to the October 5, 2004 letter, AMF immediately sent a fax to
13  Creeger, who responded by drafting another letter on October 5, 2004.

14    73.    On October 6, 2004, Neavitt and Creeger had a conversation, which
15  prompted Creeger to draft an email to Neavitt, in which he stated that GEM is
16  attempting to resolve the contingencies, but that it needed some supporting documents.

17    74.    There was no further communication between the parties, as Creeger was
18  unable to get disputes between Fairbrother and AMF, Neavitt, and AmTech resolved.

19    75.    However, on May 18, 2005, Creeger on behalf of GEM sent an email to
20  Neavitt.

21    76.    In this May 18, 2005 email, Creeger was explaining how GEM had a valid
22  purchase agreement with AMF, and that any issues with Fairbrother were "extraneous
23  to us (GEM)."

24    77.    On May 20, 2005, Mike McGill a member of AMF responded to this email
25  by explaining to Creeger that the deal between AMF and GEM was done due to the
26  Fairbrother contingencies being unresolved.

27  ///

28  ///

15

78. In response to this email, Creeger sent Mike McGill an email which states in part:

> This obsession with Fairbrother is to say the least infantile and extremely self-destructive. We are not in league with him and only communicate to finalize our agreement in place with him....Understand that whenever anyone does a little due diligence, my name and contact information becomes readily available to them. Mike, I've watched the monuments go through 15 years of transition, hundreds of court filings, and dozens of so-called purchase negotiations. That will continue for another 15 years unless I bring it to a close. The only future for the monuments is in association with our agenda....

79. At no point during any of these correspondences did GEM inform AMF or any of its members that it was the owner of this mysterious assignment, which is now at issue in the pending complaint.

80. On December 9, 2005, Larry Creeger obtained a power of attorney over Jeffory Fairbrother.

81. GEM and its members have known about the pending litigation between AMF and Fairbrother since at least May of 2004.

82. That the first time that GEM and/or Creeger informed AMF that it had any alleged assigned interest from Fairbrother was when GEM filed its complaint against AMF on January 18, 2006.

82(a). That upon information and belief, Durland and D&C are members of GEM, and financial supported the vexatious litigation conducted by GEM against AMF, and each were intended beneficiaries of the attempted fraud.

## FIRST CLAIM FOR RELIEF

### (Fraudulent Transfer)

83. AMF repeats and realleges paragraphs 1 through 82 as though fully set forth herein at length.

84. Under both state and federal statutes, a fraudulent transfer occurs if a debtor received less than "reasonably equivalent value" in exchange for the transferred property.

16

1    85. Nevada Revised Statute 112.180 states:

2         1. A transfer made or obligation incurred by a debtor is fraudulent as

3         to a creditor, whether the creditor's claim arose before or after the

4         transfer was made or the obligation was incurred, if the debtor made

5         the transfer or incurred the obligation:

6              (a) With actual intent to hinder, delay or defraud any creditor

7         of the debtor; or

8              (b) Without receiving a reasonably equivalent value in

9         exchange for the transfer or obligation, and the debtor:

10                  (1) Was engaged or was about to engage in a business

11        or a transaction for which the remaining assets of the debtor were

12        unreasonably small in relation to the business or transaction; or

13                  (2) Intended to incur, or believed or reasonably should

14        have believed that he would incur, debts beyond his ability to pay as

15        they became due.

16   86. NRS 112.180(2) states that in determining actual intent under paragraph

17        (a)

18   of subsection 1, consideration may be given, among other factors, to whether:

19        (a) The transfer or obligation was to an insider;

20        (b) The debtor retained possession or control of the property

21   transferred after the transfer;

22        (c) The transfer or obligation was disclosed or concealed;

23        (d) Before the transfer was made or obligation was incurred, the debtor had been

24   sued or threatened with suit;

25        (e) The transfer was of substantially all the debtor's assets;

26        (f) The debtor absconded;

27        (g) The debtor removed or concealed assets;

28   ///

17

1     (h) The value of the consideration received by the debtor was

2     reasonably equivalent to the value of the asset transferred or the amount of the

3     obligation incurred;

4     (i) The debtor was insolvent or became insolvent shortly after the

5     transfer was made or the obligation was incurred;

6     (j) The transfer occurred shortly before or shortly after a substantial debt was

7     incurred; and

8     (k) The debtor transferred the essential assets of the business to a lienor who

9     transferred the assets to an insider of the debtor.

10     87.    Creeger and/or GEM has a power of attorney over Fairbrother.

11     88.    Fairbrother has maintained his cause of action against AMF for money

12  owed under the February 5, 2002 promissory note between himself and AMF.

13     89.    The alleged transfer between GEM and Fairbrother was not disclosed by

14  GEM in any written form until GEM filed its complaint against AMF on January 18,

15  2006.

16     90.    The alleged transfer between GEM and Fairbrother was not disclosed in

17  any form by GEM to AMF until GEM filed its complaint against AMF.

18     91.    That GEM through Creeger sent AMF and its members AmTech and Mike

19  McGill multiple written correspondences between May 2004 and August 2005.

20     92.    That none of these written documents disclose that GEM had obtained

21  Fairbrother's interest in the Promissory Note and the Constitutional and Presidential

22  Monuments.

23     93.    That GEM does not possess any written documentation evidencing that it

24  notified AMF that GEM had obtained Fairbrother's interest in the Promissory Note or the

25  Constitutional and Presidential Monuments.

26     94.    Prior to the alleged transfer being made between Fairbrother and GEM,

27  Fairbrother had been sued by AmTech.

28  ///

18

1         95.    Prior to the alleged transfer being made between Fairbrother and GEM,

2   Fairbrother had been sued by Neavitt.

3         96.    Prior to the alleged transfer being made between Fairbrother and GEM,

4   Fairbrother had been sued by AMF.

5         97.    The alleged transfer between Fairbrother and GEM accounted for all or

6   nearly all of Fairbrother's assets.

7         98.    Upon information and belief Fairbrother has absconded out of the United

8   States.

9         99.    The value of the Constitutional and Presidential monuments are worth at

10   least $4,000,000.00.

11         100.    That to date GEM has paid little or nothing to Fairbrother in consideration

12   for the alleged assignment.

13         101.    That Fairbrother testified at his December 1, 2005, deposition that the

14   consideration received from GEM and/or Creeger was the forgiveness of $50,000.00 of

15   debt that Fairbrother owed Creeger.

16         102.    That $50,000.00 is not reasonably equivalent to the value of

17   $4,000,000.00 that GEM values the two monuments at.

18         103.    That GEM and/or Creeger did not file the Nevada UCC Financing

19   Statement regarding the Constitution or Presidential Monuments until December 28,

20   2005.

21         104.    That GEM and/or Creeger did not file the California UCC Financing

22   Statement regarding the Constitution or Presidential Monuments until December 29,

23   2005.

24         105.    That GEM and/or Creeger did not file the Virginia UCC Financing

25   Statement regarding the Constitution or Presidential Monuments until December

26   30, 2005.

27         106.    That upon the alleged transfer from Fairbrother to GEM, Fairbrother

28   became insolvent.

19

1    107.   The alleged assignment between GEM and Fairbrother occurred

2  shortly after Fairbrother had a judgment entered against him and in favor of

3  AmTech in the Eighth Judicial District Court of Nevada, case number A496000,

4  in the amount of $12,571,938.78.

5    108. That Fairbrother was given a writ of execution, stemming from Case

6  A496000, on December 1, 2005, with an amount to be garnished from him in the

7  amount of $13,359,780.47.

8    109.   That the alleged transfer between Fairbrother and GEM was

9  fraudulent in nature.

10    110.   That AmTech has been damaged in excess of $3,500,000.00 due to

11  the fraudulent transfer committed between Fairbrother and GEM.

12    111.   That AmTech is entitled to punitive damages against Fairbrother,

13  GEM, Creeger, Durland, and D&C due to their intentional, wilful, and fraudulent

14  conduct related to the alleged transfer between GEM and Fairbrother.

15                          **SECOND CLAIM FOR RELIEF**

16                               **(Civil Conspiracy)**

17    112.   AmTech repeats and realleges paragraphs 1 through 111 as though

18  fully set forth herein at length.

19    113.   That upon information and belief, Larry Creeger, Jeffory Fairbrother,

20  GEM, Durland, and D&C entered into an agreement to avoid Jeffory

21  Fairbrother's debt obligations to AmTech and Neavitt.

22    114.   That upon information and belief, the agreement entered into by

23  Creeger, Fairbrother, GEM, Durland, and D&C entailed creating back dated

24  documents, which included a document entitled "Asset Purchase Agreement"

25  dated May 19, 2004, and an "Assignment" dated March 22, 2005.

26    115.   That upon information and belief, the sole purpose of this

27  conspiracy was to deprive AmTech from obtaining satisfaction of the judgment it

28  obtained against Fairbrother in case A473659.

1    116.   That the conspiracy between Fairbrother, Creeger, GEM, Durland,

2  and D&C has resulted in a fraudulent transfer from Fairbrother to GEM.

3    117.   That as a result of said conspiracy to execute a fraudulent transfer

4  against the interest of AmTech, AmTech has been damaged in excess of

5  $500,000.00.

6    118.   That as a result of the intentional, wilful, and deliberate act of

7  conspiracy between Fairbrother, Creeger, GEM, Durland, and D&C, AmTech is

8  entitled to punitive damages against each named defendant, as well as attorney

9  fees and costs.

10                           **THIRD CLAIM FOR RELIEF**

11                              **(Special Damages)**

12    119.   AmTech repeats and realleges paragraphs 1 through 118 as though

13  fully set forth herein at length.

14    120.   AmTech has and will have to incur attorney fees to enforce its rights

15  as a result of the conduct of Defendants indicated in the First and Second claims

16  for Relief.

17    121.   The attorneys' fees that AmTech has and will incur are foreseeable

18  damages arising from the fraudulent transfer and civil conspiracy set forth in the

19  First and Second Claims For Relief.

20    122.   The attorneys' fees that AmTech has and will incur are the natural

21  and proximate consequence of the conduct referred to above in the First and

22  Second Claims for Relief.

23  ////

24  ////

25  ////

26  ////

27  ////

28  ////

21

## PRAYER

**WHEREFORE**, AmTech respectfully request Judgement as follows:

1.  For damages in favor of AmTech and against the Defendants in a sum in excess of $500,000.00;

2.  For Punitive damages in an amount to be determined at the time of trial;

3.  For attorney's fees as special damages in a sum to be determined at trial; and

4.  For such and further relief as the Court may deem just and proper in the premises.

DATED this 18th of June, 2007.

SEAN K. CLAGGETT & ASSOCIATES, LLC.

By _____
Sean K. Claggett, Esq.
Nevada Bar No. 008407
9910 W. Cheyenne Ave. Suite 110
Las Vegas, NV 89129
Attorney for the Plaintiff

22